1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10                            San Francisco Division

11

12   RONALD FRANKLIN BACON,                    Case No. 15-cv-04477-LB

                    Plaintiff,
13
                                               ORDER GRANTING SUMMARY
14         v.                                  JUDGMENT FOR THE DEFENDANTS

                                               [Re: ECF No. 17, 28 ]
     KUMAR, et al.,
15
                    Defendants.
16

17

18                              INTRODUCTION

19         Ronald Bacon filed this *pro se* prisoner's civil rights action under 42 U.S.C. § 1983 to

20   complain about the conditions at Salinas Valley State Prison. The parties have consented to

21   proceed before a magistrate judge. (ECF No. 1-1 at 16; ECF No. 8.[1]) The defendants now move

22   for summary judgment, and Mr. Bacon opposes the motion. Mr. Bacon also requests a temporary

23   restraining order. This order grants the motion for summary judgment and denies Mr. Bacon's

24   request for a temporary restraining order.

25

26

27   _____

28   [1] Citations are to material in the Electronic Case File ("ECF"); pinpoint cites are to the ECF-
     generated page numbers at the top of the documents.

United States District Court
Northern District of California

**STATEMENT**

In this action, Ronald Bacon complains that five prison doctors were deliberately indifferent to his medical needs. The dispute focuses primarily on responses to Mr. Bacon's many requests for different and/or increased pain medications between 2012 and the filing of this action on September 21, 2015. The following facts are undisputed unless otherwise noted.

Mr. Bacon was 60 years old when he filed this action, and had been in prison for 35 years. (ECF No. 1-1 at 10.)

The five defendants are prison doctors. Dr. John Chokatos worked as a physician and surgeon at Pleasant Valley State Prison, and treated Mr. Bacon at that prison. (ECF No. 17-3 at 1-2.) The other four defendants worked at Salinas Valley State Prison at the relevant time. Dr. Lawrence Gamboa worked as a physician and surgeon from March 2010 until he was appointed acting chief physician and surgeon in June 2015. (ECF No. 17-4 at 1-2.) Dr. Steven Posson worked as a physician and surgeon from September 2013 through February 2015. (ECF No. 17-6 at 1.) Dr. Edward Birdsong worked as a physician and surgeon since July 2010. (ECF No. 17-2 at 1.) Dr. Reetika Kumar held several positions: (a) from January 2011 to March 2013, she was chief physician and surgeon, and performed acting chief medical executive (CME) functions between November 2011 and August 2012; (b) from April 2013 to January 2014, she was a physician and surgeon; (c) from February 2014 to April 2015, she was the chief physician and surgeon; and (d) since May 2015, she has been the acting CME. (ECF No. 17-5 at 2.)

**1.  Medical Care Facts**

In 2008, Mr. Bacon was prescribed indomethacin and gabapentin for chronic pain, which provided relief. (ECF No. 1 at 5.) Eventually, these medications were discontinued. (*See id.*)

Indomethacin is now unavailable throughout the California Department of Corrections & Rehabilitation (CDCR) and has been since a policy change on an unstated point in time. (ECF No. 17-4 at 3.) Indomethacin had been prescribed for Mr. Bacon as late as October 2012. (ECF No. 1-2 at 16.) Starting at an unstated time (at least before mid-2014), the use of gabapentin was restricted pursuant to a mandatory directive from the CDCR's Pharmacy and Therapeutics Committee to all CDCR physicians. (ECF No. 17-5 at 4.) Under that directive, gabapentin was

restricted to these limited uses: (1) adjunctive therapy for partial complex seizures; (2) post-herpetic neuralgia; and (3) demonstrated benefit in patients with objective evidence of severe disease who are not on opioids. (*Id.*) The change in policy required prison doctors "to discontinue prescribing gabapentin for the off-label use of treating peripheral neuropathy unless they made an evidentiary showing that (1) an inmate-patient actually had objective evidence of neuropathy and (2) the patient had failed other treatment such as a trial of formulary medications." (*Id.*)

### 1.1  Dr. Chokatos

Mr. Bacon was housed at Pleasant Valley State Prison in 2012-2013, where he was seen by Dr. Chokatos several times. In addition to complaints of chronic pain, Mr. Bacon had clinical problems with his left shoulder and left ankle during the time Dr. Chokatos saw him. (ECF No. 17-3 at 2.)

Joint-replacement surgery was performed on Mr. Bacon's shoulder on October 24, 2012, after it was determined that Mr. Bacon had extensive degenerative disease in his shoulder and conservative measures to treat it had failed. (*Id.* at 2.) Following the joint-replacement surgery and physical therapy, Mr. Bacon had almost full range of motion in his left shoulder at an examination on December 4, 2012. (*Id.* at 3.)

Mr. Bacon also had osteoarthritis in his left ankle but no apparent functional limitation. (*Id.*) Dr. Chokatos' medical progress note for August 9, 2012, stated that the patient had a "significant deformity" in his left ankle but no functional impairment. (ECF No. 26-4 at 15.)

According to Dr. Chokatos, Mr. Bacon's "consistent and overriding concern appears to have been obtaining potent medications for his alleged pain. As noted above, Mr. Bacon had two areas of pain for which objective findings had been adduced, but neither of these showed any functional impairment. . . . Like his other treating physicians, I was unable to justify using narcotics or other drugs with significant abuse potential in Mr. Bacon's treatment, except for brief periods following injury or surgery." (ECF No. 17-3 at 3.) Dr. Chokatos was unable to correlate his objective findings with Mr. Bacon's subjective reports as to the location and intensity of pain on numerous

visits. (*Id.* at 4.)[2] His last encounter with Mr. Bacon occurred on May 20, 2013. (*Id.* at 2.)

Mr. Bacon was transferred to Salinas Valley State Prison on December 24, 2013. (ECF No. 1 at 12.) Upon arrival, he was in pain and told the nurse he was in chronic-pain management and needed help. The nurse said he would be seen soon but there was nothing she could do to help. (*Id.* at 12-13.) On January 17, 2014, Mr. Bacon was seen by a nurse who gave him Tylenol and/or ibuprofen. (*Id.* at 13 (Tylenol); ECF No. 26-1 at 11 (ibuprofen); ECF No. 17-7 at 7 (ibuprofen and acetaminophen).)

### 1.2  Dr. Gamboa

Mr. Bacon's first encounter with any of the defendants at Salinas Valley State Prison was on February 4, 2014, when he was seen by Dr. Gamboa, who was assigned as his primary care physician (PCP). (ECF No. 17-4 at 2.) They discussed Mr. Bacon's medical history, including his shoulder surgery and complaints of chronic pain. (*Id.*) Dr. Gamboa prescribed a higher dosage of ibuprofen (i.e., 600 mg. ibuprofen three times per day) than earlier had been ordered by the nurse and requested that Mr. Bacon be scheduled for an initial intake appointment with Pain Management. (*Id.*) Mr. Bacon was sure ibuprofen would not help him and "knew" it was hurting his stomach and liver. (ECF No. 1 at 13.) Immediately after the appointment, Mr. Bacon filed a health-care-services request form stating that ibuprofen was inadequate and asking for "reconsideration for better medication." (ECF No. 1-3 at 14.)

On February 10, 2014, Mr. Bacon submitted an inmate appeal complaining that he did not have adequate pain relief and wanted medical treatment. (ECF No. 1 at 14.) Dr. Gamboa saw him the next day, but did not change the medication he had ordered one week earlier. (*Id.* at 15.)

Mr. Bacon was given an "informed consent agreement contract for opioid treatment" to

---

[2]According to Mr. Bacon, on July 16, 2012, an unidentified person told Dr. Chokatos that Mr. Bacon was "on the yard doing some type of strenuous exercises," although a report of such activity "could not possibly be true." (ECF No. 1 at 9.) Dr. Chokatos' medical notes from July 16, 2012, state that Mr. Bacon had a significant deformity in his ankle, and complained of pain in his shoulders but "was observed on the yard today with a smooth reciprocal gait, a rapid pace, and normal push-off with both feet. There did not appear to be any impairment of locomotion and there was no limp. Likewise he was able to abduct his right shoulder beyond 180 degrees without any stress whatsoever." (ECF No. 1-2 at 8.)

complete. (*Id.* at 14.)[3] He later filled it out and turned it in to nursing staff on March 12, 2014, for Dr. Gamboa, but Dr. Gamboa did not prescribe him opioids. (*Id.*) (Elsewhere, Mr. Bacon states that he submitted a copy of the opioid agreement on February 10, 2014, with his inmate appeal. (*Id.* at 15.))

Dr. Gamboa saw Mr. Bacon on March 24, 2014, for an initial intake appointment with Pain Management. (ECF No. 17-4 at 3.) Mr. Bacon told Dr. Gamboa that, in addition to his post-surgical left shoulder, he was experiencing pain in his right shoulder, left clavicle, and left ankle. Mr. Bacon requested prescriptions for indomethacin, gabapentin, and opiates. Dr. Gamboa declined to prescribe any of these medications because "they were not medically indicated for Mr. Bacon's condition." (*Id.*) Indomethacin was no longer available in the CDCR, and the use of gabapentin had been restricted to a few limited conditions, none of which Mr. Bacon had. (*Id.*; ECF No. 17-5 at 4.) Dr. Gamboa checked with the pharmacist to make sure there was no potential for drug interactions, and then prescribed oxcarbazepine (also known as Trileptal) to be taken three times a day in addition to the 600 mg. of ibuprofen to be taken three times a day. (ECF No. 17-4 at 3.) Dr. Gamboa planned to adjust the dosage of oxcarbazepine if Mr. Bacon reported some pain relief in 30 days, and to consider an MRI once the maximum dosage of oxcarbazepine was reached. (*Id.* at 3-4.) Before the medication was adjusted, Mr. Bacon was transferred to another PCP. (*Id.* at 4.) Dr. Gamboa had no other medical encounters with Mr. Bacon as a treating physician during the relevant time.

_____

[3] Mr. Bacon describes the document as an "informed consent agreement contract for opioid treatment" (ECF No. 1 at 14) but the document is not an "agreement" or "contract" in the sense of reflecting any promise to provide him opioids if he completed the form or took some other action. The document he attaches to show the "contract" is a form entitled "initial pain assessment" on which the patient circles the affected body parts and describes his pain history, and a separate form entitled "pain management – chronic pain – opioid therapy" that provides generalized information about indications for use of opioids, monitoring usage, dosage information, and pros and cons of opioid medications. (ECF No. 1-6 at 7-10; ECF No. 1-7 at 4-8; ECF No. 1-8 at 4-8.) The latter form has no information specific to Mr. Bacon.

### 1.3  Dr. Posson

Dr. Posson saw Mr. Bacon several times from June 5, 2014, until the end of February 2015. (*See* ECF No. 17-6 at 2-3.) Dr. Posson "adjusted and changed his pain medications, in type and dosage, to attempt to provide him with pain relief, but with little or no positive results." (*Id.* at 2.) In Dr. Posson's professional experience and opinion, "opioid medications, including morphine, are not typically used to treat chronic musculoskeletal pain." (*Id.*) He therefore did not prescribe morphine for Mr. Bacon's chronic pain. (*Id.*) On the other hand, opioid medications "are appropriate for relief of short term acute pain," and Dr. Posson prescribed them for a month and a half after Mr. Bacon fell and injured his ankle on January 9, 2015. (*Id.*)

At a June 5, 2014, appointment, Dr. Posson wrote a progress note expressing concerns about Mr. Bacon's request for morphine: "I feel that his range of motion is more than he is letting on. There is no evidence of atrophy and a person who is chronically not using his shoulder would be expected to have some atrophy there around the shoulder." (ECF No. 1 at 16; *see* ECF No. 17-6 at 2.) Mr. Bacon states that he asked for morphine because other medications had been denied and Dr. Gamboa had told him he was a candidate for opioid treatment. (ECF No. 1 at 16.) Dr. Posson planned to order an MRI of the shoulder, keep the patient on NSAIDs for pain relief and "put in a nonformulary request for gabapentin." (ECF No. 1-7 at 11.) Dr. Posson requested gabapentin for Mr. Bacon, but chief medical executive Dr. Kumar denied the request. (ECF No. 1 at 16; *see* ECF No. 1-7 at 11.) (Dr. Kumar's decision-making is discussed in the next section.)

Mr. Bacon asked on unidentified dates for physical therapy. When he finally saw the physical therapist, Mr. Bacon was given some papers and told to exercise in his cell. (ECF No. 1 at 16.) At another prison on an earlier occasion, Mr. Bacon had received other therapy (i.e., deep heat treatment, ultrasound, and exercycle training) that he found more beneficial. (ECF No. 1-1 at 1.)

At some time after December 2, 2014, Mr. Bacon turned in an informed-consent agreement for opioid medications to Dr. Posson, and the latter put it in Mr. Bacon's medical record but did not order opioid medications. (*Id.* at 3.) According to Mr. Bacon, Dr. Posson "determined not to begin treatment because he said Dr. Kumar C.M.E. would just deny any request as she denied gabapentin, as she denied Cymbalta, recommending Elavil." (*Id.* at 3.)

On December 29, 2014, Mr. Bacon lay down in the yard due to severe pain in his left shoulder and was taken to the infirmary. The next day, his shoulder was x-rayed. Dr. Posson continued Mr. Bacon on the same medications. (*Id.* at 4.)

On January 9, 2015, Mr. Bacon fell in his cell and was taken to the prison emergency room, where he was examined, given Tylenol-3 and crutches, and sent back to his housing unit. He could not use the left crutch because his left shoulder was not working. (*Id.* at 5.) At a follow-up appointment on January 16, 2015, Dr. Posson replaced the crutches with a cane, issued a 14-day lay-in order (so Mr. Bacon could have meals brought to him), and referred him to the surgeon who had operated on his shoulder. (ECF No. 26-2 at 6.) Dr. Posson prescribed morphine over the next six weeks. (ECF No. 1-1 at 5-6; ECF No. 17-6 at 2.) Mr. Bacon experienced pain relief and increased functioning while receiving the morphine, and explained this to Dr. Posson, who "stated that Dr. Kumar was the problem." (ECF No. 1-1 at 5-7.) According to Mr. Bacon, Dr. Posson said that Dr. Kumar had denied Dr. Posson's requests for gabapentin and Cymbalta. (*Id.* at 7.) Dr. Posson said Dr. Kumar had asked Dr. Posson to order Elavil, which the latter did not do because Mr. Bacon had an allergic reaction to the drug in the past. (*Id.*)

On February 21, 2015, Mr. Bacon fell down in his cell because of pain in his left ankle and hit his shoulder. He was taken to the prison emergency room, where he was diagnosed as having an ankle sprain. The medical record indicates that Mr. Bacon said he wanted a "'bridge order'" for morphine;" instead, Dr. Birdsong (the physician who was on call and was consulted by telephone) prescribed 800 mg. ibuprofen, an Ace bandage and crutches, as well as advised that the patient should follow up with his PCP in five days. (ECF No. 1-9 at 14-15; ECF No. 17-2 at 2.)

When Dr. Posson saw Mr. Bacon for the follow-up appointment six days later, Dr. Posson prescribed morphine for 14 more days and said that Mr. Bacon would thereafter be seeing a different doctor because Dr. Posson was leaving "A" yard at the prison. (ECF No. 1-1 at 8.) Dr. Posson wrote a progress note that day stating that Mr. Bacon "does have some significant arthritis, so some level of pain control is necessary, but I am not sure that he actually requires morphine. His function is apparently pretty good as he is able to work as a porter wiping tables, and yet when he comes into the clinic, his gait is clearly not consistent with his ability to do that. Therefore, I

am suggesting that symptom magnification may be at work here as well." (ECF No. 1-10 at 2-3.)

On an unstated date, Dr. Posson reviewed the result of an MRI of Mr. Bacon's left shoulder with him. The radiology report had noted that the MRI yielded no useful information because of the metal device in the shoulder and that "[c]orrelation with plain film imaging is recommended." (ECF No. 1-7 at 14.) Mr. Bacon's shoulder then was x-rayed on December 30, 2014. (ECF No. 1-8 at 14.) "The shoulder x-ray showed some arthritis in the acromioclavicular joint and left shoulder arthroplasty surgical changes." (ECF No. 17-6 at 3.) According to Dr. Posson, "these are not conditions that would be treated with opioid medications." (*Id.* at 3.) The orthopedic surgeon's evaluation on February 2, 2015, revealed a good range of motion and recommendations to continue an intensive exercise program and ibuprofen. (*Id.;* ECF No. 1-9 at 9-10.)

### 1.4  Dr. Kumar

Dr. Kumar never treated Mr. Bacon or provided any other direct medical services to him. (ECF No. 17-5 at 2; ECF No. 26-3 at 6.) Her connection to his medical care is that she allegedly denied some requests for services while she performed her duties as the CME.

Under the medical-care system in the CDCR, an inmate's PCP could not unilaterally order certain specialty services (e.g., physical therapy, diagnostic tests, certain medications, and outside consultations). Rather, the PCP had to make a recommendation via a request for services, which had to be approved by an authorizing committee called the UM/MAR committee. A request for services normally was reviewed at three levels, and the second level of that review was conducted by Dr. Kumar, applying pre-set criteria.[4] (ECF No. 17-5 at 2-3.)

---

[4] According to Dr. Kumar, a request for services was normally reviewed at three levels.

> The first level review is conducted by a UM nurse. The UM nurse is required to apply InterQual (IQ) criteria and send the [request for services] to the second level for review. The second level of review is conducted by me, as the CME or designee, based on my review and analysis of the medical record, bearing in mind the IQ criteria supplied by the UM nurse. The third level of review is by the UM/MAR committee. It is a simple voting committee with majority rule. The committee members discuss the case, treatment plan, need for the request, possible alternatives, effectiveness, consistency with IQ, and cost effectiveness. Not infrequently, the UM/MAR committee recommends different treatment options than were requested. Others are simple denials or approvals. Whatever the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Mr. Bacon alleged that Dr. Kumar denied a request for a CT scan after the unsuccessful MRI

2    of Mr. Bacon's shoulder. Dr. Kumar declares that, as far as she knows, "no medical doctor

3    recommended a CT scan for evaluation of the chronic pain in Mr. Bacon's left shoulder." (*Id.* at

4    3.) Mr. Bacon presents no document showing a request for a CT scan existed or was presented to

5    Dr. Kumar. (As noted earlier, the radiologist's report for the unsuccessful MRI had recommended

6    correlation with "plain film imaging," and an x-ray had thereafter been done. (ECF No. 1-7 at 12;

7    ECF No. 1-8 at 14.)

8    Mr. Bacon alleged that Dr. Kumar denied a request for gabapentin submitted by Dr. Posson on

9    June 10, 2014. Dr. Kumar declares that she has no recollection or documentation of the request for

10   services, but also that Mr. Bacon did not meet the criteria for gabapentin because Dr. Posson

11   documented Mr. Bacon's diagnosis as 'mechanical musculoskeletal etiology.'" (ECF No. 17-5 at

12   4.) Dr. Kumar thought that gabapentin "was not medically indicated in Mr. Bacon's case." (*Id.*)

13   Mr. Bacon alleged that Dr. Kumar denied a request for Cymbalta. Dr. Kumar declares that she

14   has no documentation or recollection of his request but, "[l]ike gabapentin, Cymbalta is a non-

15   formulary medication that requires the prescribing PCP to provide sufficient medical information

16   to demonstrate medical necessity for the drug" in the request for services or it will be denied. (*Id.*

17   at 4.) In her experience and medical judgment, there are other medications which the PCP should

18   try first before trying gabapentin and/or Cymbalta." (*Id.*) Mr. Bacon presents no evidence that a

19   physician submitted a request for services with sufficient medical information to demonstrate the

20   medical necessity for Cymbalta.

21   Mr. Bacon alleged that Dr. Kumar encouraged Dr. Posson to prescribe Elavil instead of

22   gabapentin even though Dr. Kumar knew Mr. Bacon was allergic to Elavil. Dr. Kumar does not

23   recall whether she suggested Dr. Posson try Elavil for Mr. Bacon, but she denies that she would

24   knowingly recommend a medication to a patient with a known allergy to that medication. (*Id.*)

25   Prior to this lawsuit, she did not know that Mr. Bacon was allergic to Elavil. (*Id.*) Mr. Bacon

26   admits that he never received the Elavil because Dr. Posson chose not to prescribe it. (ECF No.

27

28       decision of the UM/MAR committee, it is generally is [sic] final."
         (ECF No. 17-5 at 3.)

9

26-2 at 5.)

Dr. Posson's medical progress notes for June 5, 2014, and March 20, 2015, were marked "allergies: no known drug allergies." (ECF No. 1-7 at 10; ECF No. 1-10 at 7.) In an "initial pain assessment form" dated December 8, 2014, Mr. Bacon listed his allergies as "wool & possibly Elavil." (ECF No. 1-8 at 8.)

Dr. Kumar has approved many requests for services for Mr. Bacon. (ECF No. 17-5 at 5.) She approved an MRI of his shoulder, physical therapy, and two different visits to the outside orthopedic surgeon who earlier had performed the shoulder surgery.

### 1.5  Dr. Birdsong

After Mr. Bacon was transferred to a yard a the prison, Dr. Birdsong became his PCP. (ECF No. 17-2 at 2.) On April 13, 2015, Mr. Bacon had his first appointment with Dr. Birdsong as his PCP. Dr. Birdsong reviewed Mr. Bacon's medical history; Mr. Bacon primarily wanted to address pain medications. (*Id.* at 2.) According to Mr. Bacon, Dr. Birdsong refused Mr. Bacon's request "for more ad[e]quate pain medication." (ECF No. 1-1 at 11.) Dr. Birdsong explains his decision-making in his declaration. According to Dr. Birdsong, he discontinued the sulindac (an NSAID) and carbamazepine (prescribed to treat nerve pain) after Mr. Bacon complained they were not relieving his pain. (ECF No. 17-2 at 2-3.) Dr. Birdsong rejected Mr. Bacon's request for gabapentin because "gabapentin is used to treat neuropathic pain, not nociceptive pain, as presented by Mr. Bacon" and was not medically indicated. (*Id.* at 3.) Dr. Birdsong also noted that Mr. Bacon was "wishing for opiates." (*Id.*) Dr. Birdsong decided to start Mr. Bacon on a trial of salsalate (which is a different type of NSAID) and venlafaxine (which is "an anti-depressant, but is approved on the CDCR formulary for treatment of chronic pain"). (*Id.* at 3.)

Also at the April 13, 2015, appointment, Dr. Birdsong stated that the wheelchair Mr. Bacon had been using and the arm sling would be discontinued; refused to order an MRI for Mr. Bacon's left ankle; and refused to request referrals to a specialist or physical therapy. (ECF No. 1-1 at 11.) Dr. Birdsong also declined to talk about his planned course of treatment for Mr. Bacon. (*Id.* at 12.) Dr. Birdsong asked a nurse and a correctional officer to take Mr. Bacon's wheelchair away, but they refused. (*Id.*) According to Dr. Birdsong, although Mr. Bacon had arrived in a wheelchair,

10

there was no medical chrono in the file for Mr. Bacon to have a wheelchair and Dr. Birdsong was of the opinion that there was no medical necessity for one. (ECF No. 17-2 at 3.)

At the same April 13, 2015, appointment, Mr. Bacon complained of blood in his urine. Mr. Bacon states that Dr. Birdsong refused to order imaging that day (ECF No. 26-2 at 12), but does not dispute that Dr. Birdsong did order a urinalysis and fecal occult blood testing. (ECF No. 17-2 at 3.) At a follow-up appointment a week later, Dr. Birdsong reviewed the lab results and requested a CT scan of Mr. Bacon's kidneys and abdomen. (*Id.* at 3; ECF No. 1-14 at 5.) The CT scan showed cysts on Mr. Bacon's liver. (ECF No. 1-1 at 13.) Although Mr. Bacon believes his medications are liver-threatening (*id.*), Dr. Birdsong's medical opinion is that the liver cysts and the one cyst on one of Mr. Bacon's kidneys "have no clinical significance," and Mr. Bacon's liver was not being compromised by his medications. (ECF No. 17-2 at 4.) The blood-in-the-urine problem resolved on its own. (*See* ECF No. 17-2 at 4.)

On April 24, 2015, when Mr. Bacon went to the pill line, he was given venlafaxine (also known as Effexor) for pain and began feeling strange after taking it. (ECF No. 1-1 at 12.) He soon became aware that venlaxafine was an anti-depressant as well as a drug used sometimes to treat pain. (*Id.*; ECF No. 26-2 at 14.) According to Mr. Bacon, Dr. Birdsong had "unwittingly disrupted" Mr. Bacon's mental-health care by prescribing Effexor, which interfered with the psychotropic medications Mr. Bacon took for his severe borderline schizophrenic personality and necessitated the cessation of one of his psychotropic medications. (ECF No. 1-1 at 12-13; ECF No. 26-2 at 15.) Eventually, Mr. Bacon had the venlaxafine discontinued so he could resume his normal psychotropic medication regimen on June 17, 2015. (ECF No. 1-1 at 13.)

On June 9, 2015, Dr. Birdsong saw Mr. Bacon at an office visit at which Mr. Bacon complained about his chronic pain. "Despite multiple x-rays of Mr. Bacon's back and ankle, there was no objective evidence of severe disease." (ECF No. 17-2 at 4.) Mr. Bacon said that he had been refusing to take the venlafaxine, so Dr. Birdsong prescribed Trileptal in its place. (*Id.*) Dr. Birdsong planned to continue Mr. Bacon on the salsalate and submit a request for an x-ray of Mr. Bacon's right shoulder (which he also was complaining about), and noted that there would be a follow-up visit in six months. (*Id.*)

On September 3, 2015, Dr. Birdsong and Dr. Bourne saw Mr. Bacon for a disability evaluation based on Mr. Bacon's request for a wheelchair, which prison personnel had given him after one of his falls and Mr. Bacon had been using since then without medical authorization. (*Id.* at 4-5.) Mr. Bacon offered to give up the wheelchair if he was given physical therapy. (*Id.* at 5.) Dr. Birdsong agreed to submit a request for physical therapy, and Mr. Bacon was allowed to keep his wheelchair until the completion of physical therapy. Dr. Birdsong planned to start Mr. Bacon on methadone for his chronic pain. (*Id.*) As of April 2016, Mr. Bacon's pain medications included 10 mg. of methadone twice a day and 400 mg. of ibuprofen three times per day, and Mr. Bacon had medical appliances consisting of an arm sling, cane, ankle brace, wheelchair, wheelchair gloves, walker and Ace bandages. (*See id.*) Mr. Bacon notes that Dr. Bourne, rather than Dr. Birdsong, prescribed the methadone. (ECF No. 26-3 at 4.)

## 2. Administrative Exhaustion

Mr. Bacon filed an inmate appeal on February 10, 2014, in which he complained that he was in pain and had inadequate pain relief since his arrival at Salinas Valley State Prison. (ECF No. 17-7 at 5, 7.) He wrote: "I arrived here at SVSP on 12/24/2013. I requested an initial Chronic Pain Comprehensive Visit, as I was experiencing severe arthritic and shoulder pain due to joint & nerve damage in left shoulder and arm. On 01/14/2014, I still had not been seen by anyone. I then filled-out a Sick-Call Slip and was subsequently seen by an R.N. on or around 01/17/2014." (*Id.*) He complained that the acetaminophen and ibuprofen he received from the nurse on January 17, 2014, "'barely' help[ed] at all" and the larger dosage of ibuprofen provided by Dr. Gamboa on February 4, 2014, was "of little or no help." (*Id.* at 7.) He argued generally that he had not had pain relief since around 2000 and other inmates with lesser needs had received help while he did not. (*Id.* at 7.) In the "action requested" part of the form, Mr. Bacon wrote: "Request Assessment, examination, adequate treatment, including adequate pain management so that I am able to function in my activities of daily living." (*Id.* at 5.) That inmate appeal (log # SVSP HC 14050746) was partially granted at the third level on October 9, 2014. (*Id.* at 3-4.) The inmate appeal did not mention Dr. Chokatos or Pleasant Valley State Prison.

There are two later inmate appeals in the record that received third level decision. Mr. Bacon

United States District Court
Northern District of California

1  submitted an inmate appeal on April 2, 2015, that he called a "medical/ADA accomadation [sic]

2  appeal," and requested diagnostic tests, pain medications and a "diagnosed course of treatment

3  that [he] can discuss and take part in." (ECF No. 26-7 at 1.) That inmate appeal (log # SVSP HC

4  15052780) eventually was denied at the third level on October 2, 2015. (ECF No. 26-15 at 9.)

5  Another inmate appeal, dated August 5, 2015, complained of Dr. Birdsong's decision to remove

6  him from a disability program and take his wheelchair. (ECF No. 26-11 at 11-15.) That inmate

7  appeal (log # SVSP HC 15053872) was denied at the third level on January 14, 2016. (ECF No.

8  26-12 at 6-8.) Neither of these inmate appeals mentioned Dr. Chokatos or Pleasant Valley State

9  Prison.

10                              **SUMMARY-JUDGMENT STANDARD**

11         The court must grant a motion for summary judgment if the movant shows that there is no

12  genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of

13  law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). Material

14  facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about

15  a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

16  the non-moving party. *Id*. at 248-49.

17         The party moving for summary judgment bears the initial burden of informing the court of the

18  basis for the motion, and identifying portions of the pleadings, depositions, answers to

19  interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of

20  material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving

21  party must either produce evidence negating an essential element of the nonmoving party's claim

22  or defense or show that the nonmoving party does not have enough evidence of an essential

23  element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v.

24  Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070,

25  1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving

26  party need only point out 'that there is an absence of evidence to support the nonmoving party's

27  case.'") (quoting *Celotex,* 477 U.S. at 325).

28         If the moving party meets its initial burden, the burden shifts to the non-moving party to

                                                13

produce evidence supporting its claims or defenses. *Nissan Fire & Marine Ins. Co., Ltd*., 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

Generally, when a defendant moves for summary judgment on an affirmative defense on which he bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). The failure to exhaust administrative remedies is an affirmative defense that must be raised in a motion for summary judgment rather than a motion to dismiss. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (en banc). On a motion for summary judgment for nonexhaustion, the defendant has the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Id.* at 1172. If the defendant carries that burden, the "burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* The ultimate burden of proof remains with the defendant, however. *Id.* If material facts are disputed, summary judgment should be denied, and the "judge rather than a jury should determine the facts" on the exhaustion question, *id.* at 1166, "in the same manner a judge rather than a jury decides disputed factual questions relevant to jurisdiction and venue," *id.* at 1170-71.

In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746,

14

plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Mr. Bacon's complaint is signed under penalty of perjury and the facts therein are evidence for purposes of evaluating the defendants' motion for summary judgment.

## ANALYSIS

### 1. Exhaustion of Administrative Remedies

"No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Ross v. Blake*, 136 S. Ct. 1850, 1856-57 (2016) (mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). All available remedies must be exhausted; those remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Porter,* 534 U.S. at 524. Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit. *Id.*; *Booth v. Churner*, 532 U.S. 731, 741 (2001). Section 1997e(a) requires "proper exhaustion" of available administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Proper exhaustion requires using all steps of an administrative process and complying with "deadlines and other critical procedural rules." *Id.* at 90.

The State of California provides its inmates and parolees the right to appeal administratively "any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a). In order to exhaust available administrative remedies, a prisoner must proceed through three formal levels of appeal and receive a decision from the Secretary of the CDCR or his designee. *Id.* § 3084.1(b), § 3084.7(d)(3).

The amount of detail in an administrative grievance necessary to properly exhaust a claim is determined by the prison's applicable grievance procedures. *Jones v. Bock*, 549 U.S. 199, 218 (2007); *see also Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010) ("To provide adequate

notice, the prisoner need only provide the level of detail required by the prison's regulations"). California prisoners are required to lodge their administrative complaint on a CDCR-602 form (or a CDCR-602 HC form for a health-care matter). The level of specificity required in the appeal is described in a regulation:

> The inmate or parolee *shall list all staff member(s) involved and shall describe their involvement* in the issue. To assist in the identification of staff members, the inmate or parolee shall include the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal. If the inmate or parolee does not have the requested identifying information about the staff member(s), he or she shall provide any other available information that would assist the appeals coordinator in making a reasonable attempt to identify the staff member(s) in question. [¶] The inmate or parolee shall state all facts known and available to him/her regarding the issue being appealed at the time of submitting the Inmate/Parolee Appeal form, and if needed, the Inmate/Parolee Appeal Form Attachment.

Cal. Code Regs. tit. 15, § 3084.2(a)(3-4) (emphasis added).[5]

Exhaustion of administrative remedies may occur if, despite the inmate's failure to comply with a procedural rule, prison officials ignore the procedural problem and render a decision on the merits of the grievance at each available step of the administrative process. *Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016); *e.g., id.* at 659 (although inmate failed to identify the specific

---

[5] Several Ninth Circuit cases have referred to California prisoners' grievance procedures as not specifying the level of detail necessary and instead requiring only that the grievance "describe the problem and the action requested." *See Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (quoting Cal. Code Regs. tit. 15, § 3084.2); *Sapp*, 623 F.3d at 824 ("California regulations require only that an inmate 'describe the problem and the action requested.' Cal. Code Regs. tit. 15, § 3084.2(a)"); *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) (when prison or jail's procedures do not specify the requisite level of detail, "'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought'"). Those cases are distinguishable because they did not address the regulation as it existed at the time of the events complained of in Mr. Bacon's complaint. Section 3084.2 was amended in 2010 (with the 2010 amendments becoming operative on January 28, 2011), and those amendments included the addition of subsection (a)(3). *See* Cal. Code Regs. tit. 15, § 3084.2 (history notes 11-12 providing operative date of amendment). *Wilkerson* and *Sapp* used the pre-2011 version of section 3084.2, as evidenced by their statements that the regulation required the inmate to "describe the problem and the action requested" – a phrase that does not exist in the version of the regulation in effect in and after 2011. *Griffin* is distinguishable because it discussed the Maricopa County Jail administrative remedies rather than the CDCR's administrative remedies. Whatever the former requirements may have been in the CDCR and whatever requirements may still exist in other facilities, since January 28, 2011, the operative regulation has required California prisoners using the CDCR's inmate appeal system to list the name(s) of the wrongdoer(s) in their administrative appeals.

United States District Court
Northern District of California

doctors, his grievance plainly put prison on notice that he was complaining about the denial of pain medication by the defendant doctors, and prison officials easily identified the role of pain management committee's involvement in the decision-making process).

The defendants have moved for summary judgment as to the claim against Dr. Chokatos on the ground that Mr. Bacon did not properly exhaust administrative remedies because he did not file any inmate appeal that received a decision from the third, or highest, level in the inmate appeals system about Dr. Chokatos' conduct giving rise to the claims in this action. The defendants have demonstrated that the only inmate appeals that Mr. Bacon filed about the events giving rise to his complaint that received a decision at the third, or highest, level did not concern Dr. Chokatos' treatment of Mr. Bacon. Neither Dr. Chokatos nor the care received at Pleasant Valley State Prison was the subject of any of the three inmate appeals that received a decision at the third level.

The defendants have carried their burden to demonstrate that there were available administrative remedies for Mr. Bacon and that Mr. Bacon did not properly exhaust those available remedies as to his claim against Dr. Chokatos. The undisputed evidence shows that California provides an administrative-remedies system for California prisoners to complain about their conditions of confinement, and that Mr. Bacon used that California inmate-appeal system to complain about other events that give rise to his complaint. The undisputed evidence also shows that the only inmate appeals that received a decision at the third level did not assert any wrongdoing by Dr. Chokatos, and did not mention him by name or title, even though Mr. Bacon was required to do so by the regulation in order to properly exhaust administrative remedies. *See* Cal. Code Regs. tit. 15, § 3084.2(a)(3). As a result of Mr. Bacon's failure to identify Dr. Chokatos as a wrongdoer in his inmate appeals, Mr. Bacon did not "provide the level of detail required by the prison's regulations," *Sapp*, 623 F.3d at 824, and therefore did not properly exhaust his administrative remedies against Dr. Chokatos. *See Ngo*, 548 U.S. at 90.

The fact that the prison officials resolved the appeals that concerned pain management and other medical needs at Salinas Valley State Prison does not suggest that they "ignore[d] the procedural problem" of Mr. Bacon not identifying other medical-care providers Mr. Bacon may

17

have thought provided inadequate care. Prison officials had no reason to suspect from the inmate appeals filed that Mr. Bacon was complaining of unidentified other wrongdoers at other prisons -- as he had been treated for pain for more than a decade at a variety of prisons. They did not choose to ignore a problem of which they were not made aware. *Cf. Reyes*, 810 F.3d at 658 (exhaustion occurred where "prison officials ignore[d] the procedural problem and render[ed] a decision on the merits of the grievance"). The defendants have carried their burden to show that Mr. Bacon did not properly exhaust his administrative remedies as to Dr. Chokatos.

Once the defendants met their initial burden, the burden shifted to Mr. Bacon to come forward with evidence showing that something in his particular case made the existing administrative remedies effectively unavailable to him. *See Albino*, 747 F.3d at 1172. Mr. Bacon has made no such showing. In fact, he simply ignored the exhaustion issue entirely in his 67-page opposition brief. Mr. Bacon has not met his burden to show that administrative remedies were effectively unavailable to him.

The regulation plainly required the inmate to list the name of the staff member (or to provide other identifying information, such as title or position) and to describe his/her role in the incident. *See* Cal. Code Regs. tit. 15, § 3084.2(a)(3). Mr. Bacon did not do so for Dr. Chokatos and therefore failed to properly exhaust his administrative remedies. *See Ngo*, 548 U.S. at 90-91 ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings").

Bearing in mind that the defendants have the ultimate burden of proof on the defense and viewing the evidence in the light most favorable to Mr. Bacon, the court concludes that Dr. Chokatos is entitled to judgment as a matter of law on the affirmative defense that Mr. Bacon failed to exhaust administrative remedies for his Eighth Amendment claim against Dr. Chokatos. The claim against Dr. Chokatos is not intertwined with the claims against the other defendants because Dr. Chokatos's treatment of Mr. Bacon took place at a different prison and earlier in time than the other defendants' treatment of Mr. Bacon. The claim against Dr. Chokatos can and will be dismissed, while the claims may proceed against the other defendants who do not dispute

administrative remedies were exhausted. *See generally Lira v. Herrera*, 427 F.3d 1164, 1175 (9th Cir. 2005) (when complaint contains exhausted and unexhausted claims and prisoner wishes to proceed with only the exhausted claims, the district court should simply dismiss the unexhausted claims when the unexhausted claims are not intertwined with the properly exhausted claims).

## 2. Eighth Amendment Claims

Deliberate indifference to an inmate's serious medical need violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). To establish an Eighth Amendment claim on a condition of confinement, such as medical care, a prisoner-plaintiff must show: (1) an objectively, sufficiently serious, deprivation, and (2) the official was, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). These two requirements are known as the objective and subjective prongs of an Eighth Amendment deliberate indifference claim.

To satisfy the objective prong, there must be a deprivation of a "serious" medical need. A serious medical need exists if the failure to treat an inmate's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.*

The evidence in the record showing that Mr. Bacon complained of pain related to his shoulder and ankle, earlier had received joint-replacement surgery on his shoulder, had twisted his ankle occasionally, and had x-rays indicating some degenerative changes to his shoulder and ankle suffice to permit a jury to find the existence of an objectively serious medical need. *Cf. Lolli v. Cnty. of Orange*, 351 F.3d 410, 419 (9th Cir. 2003) (Type I diabetes is a serious medical need). The defendants do not contend that Mr. Bacon had no shoulder or ankle problems, and do not contend that he had absolutely no need for care for his complaints of pain.

For the subjective prong of an Eighth Amendment claim, there must be deliberate indifference. A defendant is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at 837. The defendant must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* If the

United States District Court
Northern District of California

defendant should have been aware of the risk, but was not, then he has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, No. 12-56829, slip op. at 31 (9th Cir. Aug. 15, 2016) (*en banc*). Deliberate indifference may be demonstrated when prison officials deny, delay or intentionally interfere with medical treatment, or it may be inferred from the way in which prison officials provide medical care. *See McGuckin v. Smith*, 974 F.2d 1050, 1062 (9th Cir. 1992) (finding that a delay of seven months in providing medical care during which a medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (*en banc*). Negligence does not amount to deliberate indifference and does not satisfy the subjective prong of an Eighth Amendment claim. S*ee Wilhelm v. Rotman*, 680 F.3d 1113, 1122-23 (9th Cir. 2012) (finding no deliberate indifference but merely a "negligent misdiagnosis" by defendant-doctor who decided not to operate because he thought plaintiff was not suffering from a hernia).

A difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. *See Toguchi*, 391 F.3d at 1058; *Sanchez v. Vild*, 891 F.2d 240 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi,* 391 F.3d at 1058 (second alteration in original); *see Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer*, 511 U.S. at 837).

Having carefully reviewed the evidence, the court concludes that no reasonable jury could find in Mr. Bacon's favor on his Eighth Amendment claim against Drs. Gamboa, Posson, Kumar and Birdsong. (Because the claim against Dr. Chokatos is being dismissed for non-exhaustion, his care is not further discussed. All references to "the defendants" in this section refer to Drs. Gamboa, Posson, Kumar and Birdsong.)

The defendants have presented evidence that their decisions to deny Mr. Bacon's requests for specific medications and to provide other medications were pursuant to the exercise of their

United States District Court
Northern District of California

1    medical judgment. Mr. Bacon has no medical expertise and offers no competent evidence as to the

2    proper standard of care for his condition. Mr. Bacon is able to show that he wanted indomethacin

3    and gabapentin, but the evidence is undisputed that indomethacin was no longer used in the CDCR

4    and gabapentin's use was limited to specific conditions, none of which Mr. Bacon had. He really

5    wanted opioids, but does not offer competent evidence to controvert a defendant's medical opinion

6    that opioids are not typically used to treat chronic musculoskeletal pain.

7         Mr. Bacon and the doctors sharply disagree as to the propriety of prescribing the opioids,

8    gabapentin, and indomethacin he wants. But that does not show a genuine dispute as to a material

9    fact because the patient's personal preference does not set the Eighth Amendment standard. The

10   difference of opinion between Mr. Bacon and the defendants as to the proper course of care does

11   not show deliberate indifference. Instead, Mr. Bacon must show or raise a triable issue of fact that

12   the course of treatment a doctor chose was medically unacceptable under the circumstances and

13   that the doctor chose this in conscious disregard of an excessive risk to Mr. Bacon's health. Mr.

14   Bacon fails to make that showing.

15        Dr. Gamboa declined to prescribe indomethacin, gabapentin, and opiates because they were

16   not medically indicated for Mr. Bacon's condition. And Dr. Gamboa did prescribe some pain

17   medications, including ibuprofen and oxcarbazepine.

18        Dr. Posson opined that opioids were not typically used for musculoskeletal pain and therefore

19   declined to prescribe them for Mr. Bacon's chronic pain. Dr. Posson was concerned about Mr.

20   Bacon's request for morphine, and observed that Mr. Bacon might be exaggerating his limitations

21   because Mr. Bacon did not have the atrophy expected of someone who was not using his shoulder

22   and did well at a job that required activities inconsistent with the way he walked when he showed

23   up at the clinic. Dr. Posson did prescribe opioids after Mr. Bacon fell and injured his ankle

24   because opioids were appropriate for short-term acute pain. Dr. Posson also provided other

25   treatment: Dr. Posson substituted a cane for a crutch because Mr. Bacon could not use the crutches

26   offered him after a fall; Dr. Posson ordered an x-ray of Mr. Bacon's shoulder after a complaint of

27   severe pain in his shoulder; and Dr. Posson reviewed the report on the useless MRI, the x-ray

28   report, and an orthopedist's evaluation.

Dr. Kumar acted as sort of a gatekeeper to certain forms of care and had no direct dealings with Mr. Bacon. Mr. Bacon alleges that Dr. Kumar denied a request for a CT scan after the useless MRI was done. But he presents no competent evidence that Dr. Kumar ever received a doctor's request for such a CT scan. The evidence in the record undermines his position because it shows that the radiologist recommended "plain film imaging" and that an x-ray was later done. On that evidence, no reasonable jury could find that Dr. Kumar refused a request for a CT scan after the useless MRI. Mr. Bacon also alleges that Dr. Kumar denied requests for gabapentin, but presents no evidence that he met the established criteria for gabapentin. He also alleges that Dr. Kumar rejected a request for Cymbalta, but fails to present any evidence that a request was submitted to Dr. Kumar showing a medical necessity for Cymbalta. Finally, Mr. Bacon alleges that Dr. Kumar encouraged Dr. Posson to prescribe Elavil. Even assuming Dr. Kumar did recommend Elavil, Mr. Bacon presents no evidence that would allow a reasonable jury to conclude that she was at the time aware of his allergy to Elavil. And he concedes he never received the Elavil.

The undisputed evidence shows that Dr. Birdsong discontinued two medications only after Mr. Bacon complained that they were not working, denied gabapentin because it was not medically indicated, and denied indomethacin because it was unavailable throughout the CDCR. The undisputed evidence also shows that Dr. Birdsong prescribed a different type of NSAID and venlafaxine, an anti-depressant also approved for treatment of chronic pain.

Taken in the light most favorable to Mr. Bacon, the evidence shows Mr. Bacon had an adverse reaction to the venlafaxine prescribed by Dr. Birdsong because it interacted adversely with Mr. Bacon's psychotropic medications. But this evidence shows, at most, negligence because Mr. Bacon does not present any evidence that Dr. Birdsong was aware of and disregarded a serious risk to Mr. Bacon's health in prescribing venlaxafine. Indeed, Mr. Bacon's assertion that Dr. Birdsong "unwittingly disrupted" the psychotropic medications suggests a nonpurposeful mistake, not deliberate indifference. When Mr. Bacon next saw Dr. Birdsong and said that he was no longer taking the venlafaxine, Dr. Birdsong prescribed a replacement medication.

The evidence shows that Dr. Birdsong decided that Mr. Bacon did not need a wheelchair. But Mr. Bacon fails to present evidence that this decision was done with deliberate indifference to Mr.

1  Bacon's serious medical needs. Deciding to take away a wheelchair that apparently made it easier

2  for the inmate to get around sounds rather cold, but the inmate had other means to get around -- he

3  could walk, with or without the cane or crutch that he had. And, in fact, the wheelchair was not

4  taken from him that day. A reasonable jury could not find that Mr. Bacon's preference to move

5  about in a wheelchair presented a serious medical need. Mr. Bacon does not present any evidence

6  to dispute Dr. Birdsong's evidence that the wheelchair had not been medically authorized when

7  Dr. Birdsong decided to take it away in April 2015. Mr. Bacon states that a correctional captain or

8  some other correctional staff member had approved it, but fails to present any evidence that there

9  was documentation of a medical necessity or that anyone on the correctional staff was authorized

10  to decide the medical necessity of a wheelchair for shoulder and ankle pain. Mr. Bacon does not

11  dispute that, in September 2015, he agreed to give up his wheelchair if he was given physical

12  therapy, and physical therapy was then ordered.

13      Mr. Bacon also fails to show a triable issue in support of his claim that Dr. Birdsong was

14  deliberately indifferent with regard to the blood in Mr. Bacon's urine. Even if, as Mr. Bacon

15  states, Dr. Birdsong did not order imaging when Mr. Bacon first reported the problem, it is

16  undisputed that Dr. Birdsong ordered other diagnostic tests at the time and later ordered a CT scan

17  based on the results of the initial diagnostic tests. And Mr. Bacon does not dispute that the blood-

18  in-the-urine problem resolved on its own. Nor does he offer any competent evidence to dispute Dr.

19  Birdsong's medical opinion that the cysts shown on the CT scan were clinically insignificant.

20      Mr. Bacon did receive care at Salinas Valley State Prison, even if he was not satisfied with it.

21  Mr. Bacon twice was seen by the outside orthopedic surgeon who earlier had performed the joint-

22  replacement surgery. Mr. Bacon frequently saw doctors and other health-care providers. He

23  received diagnostic testing, including an MRI of his shoulder, x-rays of his ankle, x-rays of his

24  shoulder, blood tests, urine tests, and a CT scan of his abdomen. He was sent to physical therapy.

25  Doctors put him on different pain medications and in different dosages at different times to

26  attempt to address his complaints of pain. Mr. Bacon received medical appliances, including a

27  cane, arm sling, walker, ankle brace, Ace bandages, and (at least temporarily) a wheelchair. Mr.

28  Bacon also received medical chronos (i.e., memoranda permitting deviations from regular

1    custodial procedures based on medical needs) to address limitations related to his shoulder and

2    ankle pain. Mr. Bacon does not show, or raise a triable issue in support of his claim, that this

3    course of treatment was medically unacceptable. In addition, there is no evidence that the

4    defendants chose this course in conscious disregard of an excessive risk to Mr. Bacon's health. On

5    the evidence in the record, no reasonable jury could find the defendants were deliberately

6    indifferent to a serious risk to Mr. Bacon's serious medical needs.

7        What exists here is the sort of differences of opinion about the best way to address pain that

8    courts have repeatedly held either not to state a claim or not to create a triable issue on the

9    deliberate indifference prong of an Eighth Amendment claim. *See, e.g., Fausett v. LeBlanc*, 553 F.

10   App'x 665 (9th Cir. 20140) (affirming summary judgment for defendants where doctors did not

11   provide Valium ordered in hospital-discharge instructions after spinal-fusion surgery and instead

12   provided substitute medicine and other pain medications); *Gauthier v. Stiles*, 402 F. App'x 203

13   (9th Cir. 2010) (affirming dismissal; plaintiff's disagreement with the dosage and type of pain

14   medication administered after surgery not deliberate indifference); *Burton v. Dowrey*, 805 F.3d

15   776, 785 (7th Cir. 2015) (reversing denial of defense motion for summary judgment; jail health-

16   care provider's decision to provide synthetic opioid rather to provide opioids or contact the doctor

17   who prescribed the opioids before incarceration was not deliberate indifference); *Brauner v.

18   Coody*, 793 F.3d 493, 497 (5th Cir. 2015) (although plaintiff stated that he required more pain

19   relief than the over-the-counter and prescription medications provided by prison doctors for his

20   undisputed bone infection with open sores, "these are 'classic example[s] of a matter for medical

21   judgment'" and, as a matter of law, do not amount to deliberate indifference); *Hill v. Curcione*,

22   657 F.3d 116, 123 (2d Cir. 2011) (district court properly dismissed claim that prison officials were

23   deliberately indifferent in not prescribing medication stronger than Motrin for plaintiff's broken

24   wrist because the medication decision was a matter of medical judgment); *Meuir v. Green Cnty.

25   Jail Employees*, 487 F.3d 1115, 1119 (8th Cir. 2007) (summary judgment properly granted for

26   defendants on inmate's claim that nurses were deliberately indifferent in prescribing Motrin but

27   not medicated mouthwash for bleeding gums); *id.* at 119 ("In the face of medical records

28   indicating that treatment was provided and physician affidavits indicating that the care provided

24

was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment"). Mr. Bacon's opposition argues about Americans With Disabilities Act (ADA) issues, but the ADA claim was dismissed in the order of service and Mr. Bacon never filed an amended complaint to properly allege an ADA claim. The ADA arguments are outside the scope of this action. He may file a separate action against an appropriate defendant if he wishes to assert an ADA claim. He should bear in mind the need to exhaust administrative remedies before filing such an action.

The defendants have met their burden on summary judgment of showing the absence of evidence that they acted with the deliberate indifference necessary for an Eighth Amendment violation. When the evidence is viewed in the light most favorable to Mr. Bacon, and inferences therefrom drawn in his favor, no reasonable jury could return a verdict for him and against the defendants on his Eighth Amendment claims. Drs. Gamboa, Posson, Kumar and Birdsong therefore are entitled to judgment as a matter of law on the Eighth Amendment claims.

## CONCLUSION

The defendants' motion for summary judgment is GRANTED. (ECF No. 17.) All claims against Dr. John Chokatos are dismissed without prejudice to Mr. Bacon filing a new action against Dr. Chokatos if he ever properly exhausts his administrative remedies. Drs. Gamboa, Posson, Kumar and Birdsong are entitled to judgment as a matter of law on Mr. Bacon's Eighth Amendment claims.

In light of the determination that the defendants are entitled to summary judgment, there is no likelihood of success on the merits for Mr. Bacon and there is no need for interim relief. Mr. Bacon's third request for a temporary restraining order therefore is DENIED. (ECF No. 28.)

The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: September 20, 2016

_____
LAUREL BEELER
United States Magistrate Judge

1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    RONALD FRANKLIN BACON,                    Case No.  3:15-cv-04477-LB

              Plaintiff,
8
                                               **CERTIFICATE OF SERVICE**
9          v.

10   KUMAR, et al.,

              Defendants.
11

12          I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S.

13   District Court, Northern District of California.

14

15          That on September 20, 2016, I SERVED a true and correct copy(ies) of the attached, by

16   placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by

17   depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery

18   receptacle located in the Clerk's office.

19

20   Ronald Franklin Bacon ID: C-21194
     Salinas Valley State Prison D5-132
21   PO Box 1050
     Soledad, CA 93960
22

23

24   Dated: September 20, 2016               Susan Y. Soong
                                             Clerk, United States District Court
25

26                                           By: *R. Scott*
                                             _____
27                                           Lashanda Scott, Deputy Clerk to the
                                             Honorable LAUREL BEELER
28